

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 13, 2022

**BY ECF AND EMAIL**
The Honorable John G. Koeltl
United States District Judge
500 Pearl Street
New York, New York 10007

Re:    *United States v. Omari Williams*, S1 20 Cr. 701 (JGK)

Dear Judge Koeltl:

The Government respectfully submits this letter in advance of the December 21, 2022 sentencing of defendant Omari Williams. For the reasons set forth below, the Government respectfully submits that a significant incarceratory sentence—between the 86-month term of imprisonment imposed on codefendant Tyreek James and the 105-month term of imprisonment recommended by Probation—but a sentence below the stipulated Guidelines range of 151 to 188 months' imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing.

## I.  PRIOR CRIMINAL HISTORY

Before going on the August 2019 robbery spree that forms the basis of the instant case, the defendant, a member of the Bloods street gang (PSR ¶ 83), sustained numerous convictions:

In 2009, the defendant was adjudicated a juvenile delinquent and sentenced to a conditional discharge in connection with a grand larceny that involved property being taken from a person that occurred in 2008, when the defendant was 14 years old. (PSR ¶ 50).

In 2013, the defendant was convicted as an adult of robbery for an offense that the defendant committed in 2011, at the age of 16, and was sentenced to 7 years' imprisonment. While incarcerated, the defendant incurred a number of disciplinary sanctions. (PSR ¶ 51).

Later in 2013, the defendant was convicted of another robbery for an offense that the defendant committed in 2013, at the age of 18. The defendant placed a firearm against the victim's side, stated, "You know what time it is," reached into the victim's pocket, and stole the victim's cellphone. The defendant was sentenced to 1 to 3 years' imprisonment. While incarcerated, the defendant incurred a number of disciplinary sanctions, including fighting with other individuals, creating disturbances, harassment, and violent conduct. (PSR ¶ 52).

## II.  OFFENSE CONDUCT

In April 2019, the defendant was released from prison on the 2011 robbery described above.  (PSR ¶ 51).  Just four months later, in August 2019, the defendant and James went on a robbery spree.  (PSR ¶ 14).  From August 3 to August 21, across Manhattan, Schenectady, and Albany, they robbed three parking garages, a grocery store, a barber shop, and a cellphone store. (PSR ¶ 14).

Late at night on August 3, 2019, the defendant and James asked to be buzzed into a parking garage on East 13th Street in Manhattan.  (PSR ¶ 15).  As the parking attendant exited his booth to assist them, one of them displayed a silver handgun and ordered the attendant back into his booth.  (PSR ¶ 15).  The defendant and James took $180 from the register as well as the attendant's cellphone, valued at $219, and fled in a Porsche that was parked in the garage with the keys inside. (PSR ¶¶ 14, 16).

The defendant and James drove the stolen Porsche from Manhattan to Schenectady.  (PSR ¶ 17).  On August 5, 2019, James robbed a grocery store in Schenectady.  (*See* PSR ¶ 18).  James brandished a silver handgun, made everyone lie on the floor, and fled with $400 and four packs of cigarettes, speeding away in the stolen Porsche.  (*See* PSR ¶ 18).  Later that day, law enforcement located the empty Porsche and took it into custody.  (PSR ¶ 19).

Three days later, on August 8, 2019, the defendant and James robbed a barbershop in Albany.  (PSR ¶ 20).  One of them wielded a silver handgun, and they demanded money and property from everyone in the barbershop.  (PSR ¶ 20).  Among other things, they took the keys to a Mercedes that belonged to one of the customers in the barbershop.  (PSR ¶ 20).  The defendant and James stole that Mercedes and drove it to Schenectady.  (PSR ¶ 21).  Later that day, in Schenectady, law enforcement recovered the Mercedes and took the defendant and James into custody.  (PSR ¶ 21).  On August 14, 2019, the defendant and James were released from custody. (PSR ¶ 22).

Two days after their release, on August 16, 2019, the defendant and James robbed a parking garage on West 59th Street in Manhattan.  (PSR ¶ 23).  They entered the garage, one of them displayed a knife, and they demanded money.  (PSR ¶ 23).  They took $75 from the register, the attendant's cellphone, and the keys to an Audi, which they used to flee.  (PSR ¶ 23).

The following day, August 17, 2019, the defendant and James robbed yet another parking garage in Manhattan, this one on East 63rd Street.  (PSR ¶ 14).  One of them wielded a knife, and they made off with $200 in cash, as well as the attendant's wallet and cellphone.  (PSR ¶ 14).

The defendant and James drove the stolen Audi to Schenectady.  (PSR ¶ 25).  On August 18, 2019, the day after the third parking garage robbery, the defendant and James cased a cellphone store in Schenectady.  (PSR ¶ 25).  The following day, on August 19, 2019, the defendant and James returned to that cellphone store and robbed it.  (PSR ¶ 28).  The defendant went behind the counter, wielded a hammer and a knife, and stole a box cutter from the store.  (PSR ¶ 28).

That same day, when law enforcement located the stolen Audi, the defendant and James fled in that car. (PSR ¶ 29). After a brief car chase, the defendant and James fled on foot before being apprehended. (PSR ¶ 29).

## III.   RELATED CRIMINAL HISTORY

The defendant was charged in state court for some of the conduct described above. In February 2020, the defendant was convicted for the August 8, 2019 robbery of the barbershop in Albany and is awaiting sentencing. (PSR ¶ 54). And in July 2020, the defendant was sentenced to six years' imprisonment for the August 19, 2019 robbery of the cellphone store in Schenectady. (PSR ¶ 53).

## IV.   PRETRIAL DETENTION, COMPETENCY EVALUATION, AND
        PARTICIPATION IN THE JUDICIAL PROCESS

The defendant entered federal custody on October 23, 2020. (PSR ¶ 9). Since then, the defendant has incurred ten disciplinary infractions, including: threatening bodily harm (on four occasions); assaulting without serious injury (on four occasions), including by spitting; refusing to obey an order (on three occasions); being insolent (on three occasions); and interfering with security devices. (PSR ¶ 11).

During a pretrial conference, the defendant said the following, among other things: "As crazy as this is going to sound, [Y]our Honor, I am not ready to reenter society with the thoughts that I have in my mind. . . . The medication I was taken [*sic*] slowed those thoughts. Now that I don't have my medication, I think of harming people. So I'm not ready to get out of jail right now." (1/29/21 Tr. at 7-8). Based on those statements and others that the defendant made during that conference, the Court ordered a competency evaluation. (Dkt. 27). That evaluation concluded that the defendant was competent (*see* Dkt. 98-1 at 2) and also "indicated evidence of malingering, or faking[,] symptoms related to psychosis" (*id.* at 6). Individuals participating in the evaluation reviewed a sample of the defendant's prison calls. According to the evaluation report:

> All of the calls were to a woman listed as "Spouse." . . . The conversations reflected that the two were romantically involved. . . . When explaining [that the defendant] was at MCC Chicago for psychological evaluation, [the defendant] stated, "I'm trying to play—I'm trying to do something, I can't really say too much on this phone, but mental health wise, I'm trying to take care of something." Later, [the defendant] stated, "The shit you gotta go through to get less time is crazy."

(July 30, 2021 Forensic Evaluation Report at 11).

The defendant's participation in the judicial process is notable. On December 28, 2020, defense counsel informed the Honorable Sarah L. Cave, United States Magistrate Judge for the Southern District of New York, that the defendant had expressed to counsel through a third party that the defendant would refuse to participate in judicial proceedings until the defendant was transferred from the Essex County Correctional Facility ("Essex") to another correctional facility.

(*See* Dkt. 83 at 1). As a result, Judge Cave adjourned the previously scheduled December 29, 2020 arraignment proceeding, which was to be conducted telephonically. (*See id.*). At the time of the rescheduled proceeding, on January 8, 2021, the defendant became irate, hung up the phone, and stormed away, and the proceeding was adjourned. (*See id.*). On January 13, 2021, a telephonic pretrial conference was held, which presented another opportunity for the defendant to be arraigned, but the defendant again refused to come to the phone and to participate in the proceeding. (*See id.*). On January 22, 2021, at the Government's request, the Court entered a force order. (Dkt. 23). On January 27, 2021, the defendant appeared remotely for an arraignment, but, before the defendant could be arraigned, the defendant became irate, hung up the phone, and left the room. (*See* Dkt. 83 at 1). Subsequently on January 27, 2021, at the Government's request, the Court entered an updated force order that permitted the authorities to use reasonable force to ensure that the defendant would not only leave the defendant's cell and come to proceedings, but also remain at proceedings, including remote proceedings. (Dkt. 25). On August 12, 2021, the defendant, now at the Metropolitan Detention Center, became irate during a telephonic proceeding, hung up the phone, initially refused to return to the phone, eventually returned to the phone, and then hung up again. (*See* 8/12/21 Tr. at 5-7, 14). On April 26, 2022, the defendant refused to participate in a telephonic proceeding. (*See* Dkt. 83 at 1). On May 3, 2022, the defendant failed to get on the prison transport scheduled to take the defendant to an in-Court proceeding. (*See id.*). On May 4, 2022, at the Government's request, the Court entered another force order. (Dkt. 85). On May 10, 2022, the defendant requested that the Court recommend that the defendant be transferred back to Essex. (*See* Dkt. 86).

## V.  GUILTY PLEA AND STIPULATED GUIDELINES RANGE

The defendant was charged by a superseding indictment in five counts. (PSR ¶ 1). Count One charged the defendant with Hobbs Act robbery conspiracy, for the three August 2019 parking garage robberies in Manhattan. (PSR ¶ 2). Count Two charged the defendant with Hobbs Act robbery, for the August 3, 2019 parking garage robbery on East 13th Street. (PSR ¶ 3). Count Three charged the defendant with Hobbs Act robbery, for the August 16, 2019 parking garage robbery on West 59th Street. (PSR ¶ 4). Count Four charged the defendant with Hobbs Act robbery, for the August 17, 2019 parking garage robbery on East 63rd Street. (PSR ¶ 5). Count Five charged the defendant with possession of a firearm in furtherance of a crime of violence, for brandishing the firearm as part of the August 3, 2019 parking garage robbery on East 13th Street. (PSR ¶ 6).

On May 10, 2022, the defendant pled guilty, pursuant to a plea agreement, to Count Four, which, again, charged the defendant with Hobbs Act robbery, in violation of Title 18, United States Code, Sections 1951(a) and 2. (PSR ¶ 8). Count Four carries a maximum term of imprisonment of twenty years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment. (PSR ¶¶ 108, 112, 116-17).

The plea agreement and Probation agree on the Guidelines calculation. Pursuant to U.S.S.G. §§ 2B3.1(a), the base offense level is twenty. Pursuant to U.S.S.G. § 2B3.1(b)(2)(E),

because a dangerous weapon was brandished, three levels are added.  Thus, the applicable Guidelines offense level would be 23, except that the defendant is a career offender because of the defendant's two 2013 robbery convictions, so the offense level is 32.  After a three-level decrease for acceptance of responsibility, the defendant's total offense level is 29.  (PSR ¶¶ 8, 38-48).

The defendant's criminal history, discussed above, results in ten criminal history points, but, regardless, because the defendant is a career offender, the defendant's Criminal History Category is VI.  (PSR ¶¶ 8, 49-57).  Accordingly, the defendant's Guidelines range is 151 to 188 months' imprisonment.  (PSR ¶¶ 8, 109).  Probation recommended a sentence of 105 months' imprisonment.  (PSR p. 27).

Pursuant to the plea agreement, the defendant agreed to forfeit $275, representing proceeds traceable to the commission of the offense charged in Count Four (*i.e.*, the $200 in cash stolen from the parking garage on East 63rd Street, as well as the value of the attendant's wallet and cellphone).  (PSR ¶ 8).  The Government respectfully requests that the Court enter the Consent Preliminary Order of Forfeiture attached hereto as Exhibit A.  Similarly, pursuant to the plea agreement, the defendant agreed to pay $774 in restitution.  (PSR ¶¶ 8, 120-21).  In addition to the $275 for the victims of Count Four (just described), that restitution sum consists of: (i) $180 for the East 13th Street parking garage robbed on August 3, 2019; (ii) $219 for that garage's attendant; and (iii) $100 for the attendant of the West 59th Street parking garage robbed on August 16, 2019.  The Government respectfully requests that the Court enter the Consent Order of Restitution attached hereto as Exhibit B.[1]

## VI.   SENTENCE OF CODEFENDANT

The Court sentenced James to 86 months' imprisonment.  (Dkt. 79 at 2).[2]  James's Guidelines range was 120 to 150 months' imprisonment (although James's plea agreement, based on incomplete criminal history information, stipulated a Guidelines range of 92 to 115 months' imprisonment), and Probation recommended a sentence of 120 months' imprisonment.  (Dkt. 71 at 4).

The defendant asserts that James was the defendant's boyfriend, that part of the defendant's motivation to commit the 2019 robberies was a desire to please James, and that the defendant acted in part at James's direction.  (*See, e.g.*, Dkt. 98 at 3).  Although the Government has no evidence that *disproves* those assertions, the Government also is aware of no evidence that *supports* them.  That apparent absence of corroboration is notable given that the voluminous discovery in this case included, among other things, James's cellphone, pole camera footage and surveillance camera footage of the defendant and James, and statements made by the defendant, by James, and by relatives of James.  Similarly notable is the lack of corroboration in the PSR, the competency

---

[1] As noted in the Consent Order of Restitution, the Government respectfully requests that the Schedule of Victims be filed under seal, consistent with 18 U.S.C. §§ 3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1.

[2] The PSR incorrectly states that James was sentenced to 83 months' imprisonment.  (PSR ¶ 12).

evaluation report, the defendant's plea allocution, James's plea allocution, and James's sentencing submission and presentation.

## VII.  DISCUSSION

In this case, the combination of the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, weighs in favor of a substantial term of imprisonment.

A substantial term of imprisonment is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. Over the course of eighteen days (during only twelve of which the defendant was at liberty) and across three cities, the defendant participated in six robberies—three involving a gun, and three a knife—stealing, among other things, three cars, three cellphones, and over $850 in cash, before leading law enforcement on a car and foot chase.  As Probation put it, although "nobody was physically harmed during the spree," "these crimes were still violent and brazen[,] with the defendants[] displaying weapons and stealing three motor vehicles," and  "[t]he robberies likely caused psychological trauma to many victims." (PSR p. 28).  Indeed, given the nature of the defendant's crimes, it was mere luck that serious injury did not result.  The seriousness of the defendant's offense speaks for itself and cries out for just punishment.  The defendant's lack of respect for the law is apparent in, among other ways, the defendant's historical and recent infractions while in custody and the manner in which the defendant frequently behaved during the judicial process.

A substantial term of imprisonment is also necessary in light of the defendant's history and characteristics, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.  The defendant is a career offender who has repeatedly engaged in robberies.  The defendant previously received sentences as high as seven years' imprisonment, but those have been inadequate to deter the defendant.  The defendant commenced the instant robbery spree only a few months after being released from prison on another robbery, and the six days the defendant spent in custody following the Schenectady grocery store robbery and the Albany barbershop robbery did nothing to deter the defendant:  Two days after being released, the defendant picked right back up where the defendant had left off, robbing two more parking garages and a cellphone store.  The defendant's repeated prison disciplinary infractions are relevant to deterrence and incapacitation considerations as well.  The defendant's demonstrated unwillingness or inability to conform the defendant's behavior to the standards of a nonviolent society cries out for either deterrence (in the case of unwillingness) or incapacitation (in the case of inability). Either way, a significant term of imprisonment is required to prevent the defendant from committing other crimes and endangering other people.

In the Government's view, a sentence within the stipulated Guidelines range of 151 to 188 months' imprisonment would create an unwarranted sentence disparity with James, who was sentenced to 86 months' imprisonment.  That said, and although the defense raises some points in mitigation, including about the defendant's troubled upbringing, addiction issues, and mental health issues, nothing in the defense submission justifies the request for a sentence of 63 to

78 months (*see generally* Dkt. 98), which would itself create an unwarranted sentence disparity with James's 86-month sentence. A previous sentence of approximately 84 months failed to convince the defendant to abandon a life of crime, and the defense offers no reason to think that the result would be any different this time around. Rather than trying more of the same and hoping for a different result, this Court has the opportunity to deliver the defendant and the community a powerful message about the repercussions of engaging in violent, senseless acts.

## VIII.  CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a significant incarceratory sentence—between the 86-month term of imprisonment imposed on James and the 105-month term of imprisonment recommended by Probation—but a sentence below the stipulated Guidelines range of 151 to 188 months' imprisonment.[3]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _Samuel P. Rothschild_
Samuel P. Rothschild
Assistant United States Attorney
(212) 637-2504

cc:    Carlos M. Santiago, Esq. (by ECF and email)

---

[3] Like Probation, the Government respectfully recommends that the sentence imposed in this case be ordered to run concurrently with the undischarged portion of the six-year sentence that the defendant is serving for the robbery of the Schenectady cellphone store. (PSR pp. 27, 29).